## STATE OF DELAWARE v. RICHARD MITCHELL

*(September* 1, 1965)

LYNCH, J., sitting.

*Jay H. Conner,* Deputy Atty. Gen., for the State of Delaware.

*Theodore F. Sandstrom,* (of Killoran & Van Brunt), for Royall and Blanche Thompson, sureties on the Bail Bond.

Superior Court of Delaware, for New Castle County, No. 815 Criminal Action 1964.

LYNCH, Judge.

Richard Mitchell, a Pennsylvania resident, was arrested on August 4, 1964 by the Avondale, Pennsylvania, police on a charge of receiving stolen goods—an act committed in Delaware. He was taken before a magistrate and held for extradition to Delaware. On August 7, 1964, he waived extradition and the Newark, Delaware, police brought him to Delaware. A charge of burglary in the fourth degree was placed against Mitchell and he was held for prosecution in this court, and in lieu of bail he was committed. On August 10, 1964, Royall and Blanche Thompson, private and personal sureties[1], posted a $1,000.00 bail bond with a magistrate at Newark, Delaware, to secure defendant's release and he was released on bail.

----

[1]The stipulation states that Mitchell is a nephew of Mrs. Thompson, by blood, and of Mr. Thompson by marriage. The Thompsons received no bond premiums or other compensation for becoming sureties on the bail bond.

Mitchell had been arrested by the police of Highland Township, Pennsylvania, on July 17, 1964 on a charge of receiving stolen goods—this arrest related to an offense committed in Pennsylvania. A $500.00 cash bond had been posted to secure his release on bail on such charge. Thus it appears that when he was before the Delaware authorities on August 10, 1964 defendant was already on bail for this prior Pennsylvania charge. The stipulation states that Mitchell's sureties did not know about his prior offenses in Pennsylvania or that he was out on bail when they gave bail in this case. The State says it has no information from which to determine the truth or falsity of this contention.

After August 10, 1964 Mitchell returned to his home in Pennsylvania. Later he stood trial in Pennsylvania on the July 17, 1964 charge of receiving stolen goods and having been found guilty and he was sentenced on November 23, 1964 to serve a jail sentence of six to twelve months in the Chester County Farms jail. On February 26, 1965 he entered a plea of guilty on another charge, on indictment returned September 15, 1964 by the Grand Jury of Chester County, Pennsylvania, on a charge of receiving stolen goods and on that date he was given another jail sentence of six to twelve months, commencing at the expiration of the sentence he was then serving pursuant to the November 23, 1964 sentence. The Warden of the Chester County Farms jail advises he will have served the requisite time on the two Pennsylvania charges and thus be eligible for release, to the Delaware authorities, on November 25, 1965.

Mitchell was indicted by the Grand Jury in Delaware in this case on September 14, 1964—on the charge on which the Thompsons posted bond. The court furnished counsel to Mitchell and he entered a plea of not guilty and the matter was set down for trial. The records of the Prothonotary's Office for New Castle County show that Mitchell's case was continued on December 11, 1964, until the March Term of Court because defendant was then incarcerated in a jail of a foreign state. Mitchell's attorney in this case says the continuance was not on or at Mitchell's request.

On December 14, 1964, a subpoena was issued by this court seeking to compel Mitchell's attendance in this court on December 18, 1964 for call of the criminal calendar and trial. When he failed to appear a capias issued. Since it appeared he was incarcerated in Pennsylvania the Attorney General's Office moved then to forfeit his bail bond, following this up with a formal motion, filed on June 15, 1965.

The sureties vigorously opposed the State's motion. Briefs have been filed and exchanged; the case was orally argued most vigorously and it is now ready for decision.

Having fully stated the pertinent facts, it seems appropriate to first state and consider the language of the constitutional provisions that appear there and in our statutes and in our Court Rules relating to bail, to see what rights an accused and his bondsmen have, after which the court will take up and consider the contentions advanced by the sureties in their briefs and at oral argument.

The language of the bond given by Mitchell and his sureties, so far as is pertinent, reads:

"* * * UPON CONDITION that if the above bound RICHARD MITCHELL be and appear before the SUPERIOR COURT AND ANY FUTURE TERM THEREOF, to be held at Wilmington, for the County aforesaid there to answer such matters and things as shall be objected against him, and particularly touching a charge of DID FELONIOUSLY BREAK & ENTER INTO THE FLYING 'A' SERVICE STATION LOCATED AT 610 SOUTH COLLEGE AVE., NEWARK, DELAWARE, WITH THE INTENT TO COMMIT THE CRIME OF LARCENY THEREIN, IN VIOLATION OF TITLE 11, SEC. 395 OF THE 1953 REVISED CODE OF THE STATE OF DELAWARE, AS AMENDED said to have been committed by the said RICHARD MITCHELL at PENCADER Hundred, in said county, on the 17th day of May, A.D. 1964, and shall not depart the Court without leave thereof until final judgment of the Court on said matters charged against him, then this recognizance to be void, otherwise to be in full

force and virtue.

"* * *."

Art. 1, Sec. 11, of the 1897 Constitution, *Del. C.* Ann., provides, among other matters:

"Section 11. Excessive bail shall not be required * * *."

"Section 12. All prisoners shall be bailable[2] by sufficient sureties, unless for capital offenses when the proof is positive or the presumption great; * * *."

Our Annotated Code, as amended, has two separate chapters touching on the subject of bail[3].

Chapter 21 of Title 11 of our Annotated Code, the title of which is denominated "CRIMES AND CRIMINAL PROCEDURE", applies to bail in criminal matters. The pertinent sections of Title 11, which may throw some light on the matters before the court, read as follows:

----

[2] A like provision appeared in the 1792 Constitution, in the 1831 Constitution and now in the 1897 Constitution. There was no like language in the 1776 Constitution. The history of bail in Delaware was referred to briefly in *Quillen v. Betts*, 9 Terry 93, 48 Del. 93, 98 A. 2d 770, 772 (Supreme Court, 1953). The statutes of Delaware, when it, with Pennsylvania, was a colonial province, provided a man must generally be released on bail. During the time when Patrick Gordon was Governor of New Castle, Kent and Sussex Counties on the Delaware and the province of Pennsylvania, when King George II was King, an Act was passed by the provincial legislature, now appearing in Vol. 1, Del. Laws, Ch. 58, p. 135, providing:
"That all prisoners shall be bailable by one or more sufficient sureties to be taken by one or more of the judges or justices that have cognizance of the fact, unless for such offences as are or shall be made felonies of death by the laws of this government, * * *."

[3] Chapter 33 of Title 10 of such Code, which title was denominated "COURTS AND JUDICIAL PROCEDURE" by the General Assembly at the time of adoption of the Code, seemingly applies only to matters of bail in civil matters and I find nothing in it that relates to criminal proceedings. The statute has no form of bail bond, nor does it prescribe the contents and conditions of such bonds.

Title 11 *Del. C.* Sec. 2101, provides that, except in capital crimes—

"* * * a person arrested by virtue of process issued upon an indictment or information * * * shall be [freed on bail pending trial.] * * *. The court * * *, or any Judge thereof, or the Attorney General, may determine the sum in which bail shall be taken, and set it down on the process; or if no sum is so determined, the officer issuing the process shall set down what sum he deems reasonable for bail."

Title 11 *Del. C.* Sec. 2104(c), provides that:

"(c) If, after pleading to an indictment or information and before final judgment, a person * * * departs from the court with intention not to abide by the judgment thereof, the recognizance previously entered into for his appearance at the court shall be delcared forfeited, in like manner as a recognizance is now forfeited by default, and proceedings had on such forfeited recognizance as are now provided by court rule or by the laws of this State."

Title 11 *Del. C.* Sec. 2105, provides the form and procedure of bail bonds, it being stated that—

"Bail shall be taken by the prothonotary, clerk of any court having jurisdiction in criminal proceedings, sheriff, or officer to whom the process is directed, by a joint and several bond executed, by the accused and his bail, to the State, in the sum set down for bail upon the process, *with condition, in substance, that if the accused appears in the court,* mentioned in the process, *at the time and place of the return thereof, to answer as expressed therein, and does not depart the court without leave, the bond shall be void.* Bond so taken shall be returned with process, and, if default is made, it shall be recorded thereon in the same manner as in the case of a recognizance." (Emphasis supplied)

Except as appears in Title 11 *Del. C.* Sec. 2105, the statute does not prescribe the form or contents of bail bonds in criminal matters, except as to "the condition of the bond". No procedure is set forth in the statute for forfeiture proceedings. Rule 46(f), Rules of Criminal

Procedure for Superior Court, *Del. C.* Ann., gives the procedure. It appears that the bond in this case meets the statutory requirement.

The Rules of Criminal Procedure for the Superior Court include rules on bail. For instance, Rule 5(b) directs a committing magistrate to "admit the defendant to bail as provided in these rules".

Rule 5(c)—referring to Preliminary Hearings—also provides "The committing magistrate shall admit the defendant to bail as provided in these rules".

Rule 9(b)(1) provides:

"* * *. The amount of bail may be fixed by the court or the Attorney General and shall be endorsed on the warrant."

Rule 12(b)(5) provides, *inter alia,* that if the "court grants a motion based on a defect in the institution of the prosecution or in the indictment or information, it may also order that the defendant be held in custody or that his bail be continued for a specified time pending the filing of a new indictment or information".

Rule 32(a)—relating to sentence and judgment—among other things, provides that:

"Pending sentence, the court may commit the defendant or continue or alter the bail."

Rule 42(b)—relating to criminal contempt—provides *inter alia* that "The defendant is entitled to admission to bail as provided in these rules".

Rule 46 provides:

"(a)Right to Bail. A defendant shall be admitted to bail either before conviction or after conviction and pending appeal in accordance

with the Constitution and laws of this State.

"(b)[4] * * *.

"(c) Amount. If the defendant is admitted to bail, the amount thereof shall be such as in the judgment of the court or committing magistrate will insure the presence of the defendant, having regard to the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant.

"(d) Form, and Place of Deposit. A person required or permitted to give bail shall execute *a bond conditioned upon his appearance at all stages of the proceedings until final determination of the cause unless otherwise ordered by the court.* One or more sureties may be required, cash or bonds or notes of the United States or of the State of Delaware may be accepted and in proper cases no security need be required. Bail given originally on appeal shall be deposited with the committing magistrate or the clerk of the court from which the appeal is taken. All bail bonds shall be promptly forwarded to the prothonotary of the Superior Court to which the defendant is held to answer. (Emphasis supplied)

"(e) Justification of Sureties (Omitted).

"(f) Forfeiture.

"(1)   Declaration. *If there is a breach of condition of a bond, the court shall declare forfeiture of the bail.* (Emphasis supplied)

"(2)   Setting Aside. *The court may direct that a forfeiture be set aside,* upon such conditions as the court may impose, *if it appears that justice does not require the enforcement of the*

---

[4] Relates to bail for a material witness.

*forfeiture*[5] .(Emphasis supplied)

"(3) Enforcement. When a forfeiture has not been set aside, the court shall on motion enter a judgment of default and execution may issue thereon. By entering into a bond the obligors submit to the jurisdiction of the court and irrevocably appoint the clerk of the court as their agent upon whom any papers affecting their liability may be served. Their liability may be enforced on motion without the necessity of an independent action. The motion and such notice of the motion as the court prescribes may be served on the clerk of the court, who shall forthwith mail copies to the obligors to their last known addresses.

"(4) Remission. After entry of such judgment, the court may remit it in whole or in part under the conditions applying to the setting aside of forfeiture in paragraph (2) of this subdivision.

"(g) Exoneration. When the condition of the bond has been satisfied or the forfeiture thereof has been set aside or remitted, the court shall exonerate the obligors and release any bail. A surety may be exonerated by a deposit of cash in the amount of the bond or by a timely surrender of the defendant into custody."

At oral argument, there was some discussion of and consideration given to the restraints on a person on bail and where he could go, and particularly if he could depart from the State. Ordinarily that seems to depend on the form of the bond or court rule and too

----

[5]The sureties, through counsel, have greatly stressed this language; in effect, they have argued this language is a limitation on the court's power to declare a forfeiture. It is to be noted only that the language of the rule gives the court discretion to set aside and/or remit a forfeiture of a bail bond. No language appears in the rules which provides that a court is given any discretion in ordering the forfeiture of the bail bond. Contrariwise, Rule 46(f) (1) provides that "[i]f there is a breach of condition of a bond, the court *shall* declare forfeiture of the bail" (Emphasis supplied). Seemingly, if it appears the principal in a bail bond has violated the condition of the bond, it is for the court to order a forfeiture.

much generalization seems questionable[6]

At oral argument the attorney for the sureties made a very strenuous argument, based on a so-called estoppel and also on what he probably meant considerations of public policy, urging that there was some kind of a duty on the court, taking the bond to inquire into and ascertain if the defendant was under bail in another state, and if so to make the bail high enough to make certain that the defendant would be present in court when this case was called for trial. It appears, after analysis, the argument is without substance. In light, however, of the vigor of the arguments advanced by sureties and the seeming logic on which their counsel based his arguments, it seems desirable that the court fully consider and discuss the background of bail at common law and then by statute in this state to test the merit of such arguments.

There is a most interesting discussion of bail in Sir James Stephen's, History of the Criminal Law of England (1883) (excerpted in Vol. 2, Select Essays in Anglo-American Legal History, Little, Brown & Company, 1908, Vol. 2[7]). This discussion is set forth under what Stephen has referred to as Criminal Procedure. Stephen points out (page 444):

"The foundation of the whole system of criminal procedure was the prerogative of keeping the peace, which is as old as the [English] monarchy itself, and which was, as it still is, embodied in the expression, 'The King's Peace,' the legal name of the normal state of society. This prerogative was exercised at all times through officers collectively described as the Conservators of the Peace. * * * the ordinary conservators of the peace were the sheriff, the coroner, the

----

[6]The language of the condition of the bond before the court, in effect, states that the defendant under bail shall "not depart the court without leave". Some cases indicate this means the geographical limits of the court's jurisdiction; the cases are not uniform; the practice is less than clear.

[7]Pages 444/479. All page references herein are to these essays.

justices of the pease, [and] the constable, each in his own district. * * * ."

continuing, Stephen notes (page 445) that the language of the Assize of Clarendon (1166) provided:

"* * * that the sheriffs and justices should make inquiry upon the oath of twelve men from every hundred and four men from every township whether any man in any township was a robber, murderer, or thief, or a receiver of robbers, murderers, or thieves; that every person so accused should be taken and brought before the sheriffs and by them before the justices, * *."

Six "committees of judges * * * were to visit the circuits then marked out"; seemingly these judges did not get around to the assizes more than four times a year. Stephen proceeds (Id.) "* * * no lord of a franchise * * * should interfere to prevent the sheriff from entering his franchise * * * to arrest accused persons, * * *."

Stephen then notes (p. 448):

"Shortly the system just described was as follows. Upon the commission of a felony any one might arrest the offender, and it was the duty of any constable to do so. If the offender was not arrested on the spot, hue and cry might * * * be raised. * * *."

Stephen observes (p.449) that

"The Assize of Arms and the Statute of Winchester fell into disuse, but the right of summary arrest in cases of felony continues to this day to be the law of the land, * * *."

Subsequently, on the same page, Stephen says:

"One great alteration was made in the system just described between the fourteenth and the seventeenth centuries. During that period, summonses and warrants superseded the old hue and cry which

practically fell into disuse. The history of this substitution is curious."

In aid of his explanation, the author brings out (Id.):

"Justices of the peace were first instituted in 1326. Their duties were described in the most general terms. They were by 1 Edw. 3, c. 16, 'assigned to keep the peace.' By 34 Edw. 3, c. 1 (1360), they were empowered 'to take and arrest all those they may find by indictment or suspicion and put them in prison.' * * *."

Stephen next says (Id.):

"* * *. By degrees, * * *, the practice of issuing warrants came into use. The general authority of the justices in all matters relating to crime and indeed to the whole internal government of the country was firmly established by a great variety of statutes, and it would be natural that their directions should be taken when a crime was committed. It would also be more natural for the justice to authorize the constable to undertake the actual arrest of the offenders than to do it himself, and it might often be convenient, if a suspected person was to be searched for in more directions than one, to give written authority to various persons for the purpose."

After discussing what we now know as the Preliminary Hearing, Stephen takes up consideration of the background and history of bail, noting at page 472 et seq.:

"The next step to the preliminary inquiry held by the magistrates is the discharge, bail, or committal of the suspected person. Little need be said of the law as to the discharge or commital of the suspected person. * * *. The law of bail has a separate independent history.

*"The right to be bailed in certain cases is as old as the law of England itself, and is explicitly recognized by our earliest writers. When the administration of justice was in its infancy, arrest meant imprisonment without preliminary inquiry till the sheriff held his tourn*

*at least, and in more serious cases, till the arrival of the justices, which might be delayed for years, and it was therefore a matter of the utmost importance to be able to obtain a provisional release from custody.* * * *," (Emphasis supplied.)

"These very ancient authorities [referring to some early legal authors] are somewhat general in their language, but it is still possible to trace the history of the law relating to bail from the beginning of the reign of Edward I. to our own days.

"The sheriff was the local representative of the Crown, and in particular he was at the head of all the executive part of the administration of criminal justice. In that capacity he, as I have already shown, arrested and imprisoned suspected persons, and, if he thought proper, admitted them to bail. The discretionary power of the sheriff was ill defined, and led to great abuses, which were dealt with by the Statute of Westminister the First (3 Edw. 1, c. 12, A.D. 1275). This statute was for 550 years the main foundation of the law of bail. * * *.

"* * *.

"* * *. * * *, the Statute of Westminster determined what offences were bailable or not for five centuries and a-half.

"Between 1275 and 1444, however, the sheriffs' powers had been to a great extent transferred to the justices of the peace in whom the power of admitting prisoners to bail was vested by a series of statutes.

"* * *."

In a Report to the National Conference on Bail and Criminal Justice, held in Washington, D. C. on May 27-29, 1964, it is stated that the history of bail—

"* * * originated in medieval England as a device to free untried

prisoners. Disease-ridden jails and delayed trials by traveling justices necessitated an alternative to holding accused persons in pretrial custody. At first sheriffs exercised their discretion to release a prisoner on his own premise, or that of an acceptable third party, that he would appear for trial. If the defendant escaped, the third party surety was required to surrender himself; hence he was given custodial powers over the accused. Bail literally meant the bailment or delivery of an accused to jailors of his own choosing. In time, sureties—who were usually required to be property owners—were permitted to forfeit promised sums of money instead of themselves in the event the accused failed to appear.

"In 1275 the Statute of Westminister undertook to regulate the discretionary bail powers of sheriffs by specifying which offenses were bailable and which were not. Eventually, the sheriff's bailing functions were transferred to justices of the peace. Common law rules for exercising their discretion were based upon the nature of the charge, the character of the accused and the weight of the evidence. Later English statutes elaborated the procedure for obtaining bail. And in 1688 the Bill of Right established protection against excessive bail.ne.

"In 17th century England few defendants were sufficiently mobile to flee, and the consequences of flight—outlawry and confiscation—were harsh enough to make it an uncommon occurrence. In addition, most bailed offenders were known personally to the sheriff or justice of the peace and had reputations for trust worthiness, attested to by their ability to get third persons of local esteem as sureties." This report also states (p. 2):

"The development of bail rights and obligations in America has followed a different course. The United States Constitution does not specifically grant a right to bail. The Eighth Amendment states only that 'Excessive bail shall not be required.' * * *."

The report points out that thirty-nine states guarantee a right to bail before conviction in non-capital crimes. Four states limit the power

to deny bail to treason and murder cases and three states grant an absolute right to bail only in misdemeanor cases. Four states allow judges almost complete discretion, in accord with the common law.[8]

This report, considered the enactment by the Congress of the Judiciary Act of 1789, 1 Stat. 73, 91, which provided that "upon all arrests in criminal cases, bail shall be admitted, except when the punishment may be death * * *", then proceeded to say that the Judiciary Act made "bail in capital cases discretionary," depending upon the "nature and circumstances of the offense, and of the evidence, and usages of law". The report then notes:

"* * *. *This absolute right to bail* in a country with a virtually limitless frontier *called for the development of new techniques* to supplement the private surety who would personally guarantee to produce his bailee. *As a result, the institution of the bondsman arose to take over the function of posting bail. In return for a money premium, he guaranteed the defendant's appearance at trial. In the event of nonappearance, the bondsman stood to lose the entire amount of his bond.* For this reason, bondsmen in many jurisdictions required indemnification contracts or collateral from the defendant or his relatives to protect themselves from forfeiture losses. Selling bail bonds became a thriving commercial adjunct to the judicial function of setting bail. (Emphasis supplied.)

"In the everyday administration of criminal justice in American courts, the legal right of an accused person to bail can usually ripen into pretrial freedom only upon the consummation of a commercial bail transaction. As early as 1912, *the Supreme Court, [Leary v. United States,* 224 U.S. 567, 575 (1912); 32 S. Ct. 599,600; 56 L. Ed. 889 (1912)] *recognized that the bondsman's interest to produce the body of the principal in court is impersonal and wholly pecuniary'.* At the same time the accused's absolute right to bail in noncapital cases was

––––

[8]Blackstone (Sharswood Ed.), Book 4, pages 297-300 et seq., discusses the common law aspects and phases of bail in criminal cases.

steadfastly defended." (Emphasis supplied)

The report, at a subsequent point, states:

"*The American judge's discretion in setting pretrial bail in noncapital cases has consistently been interpreted to allow latitude only in determining the bail amount.* The opinions in *Stack v. Boyle*[342 U.S. 1, 4, 72 S. Ct. 1, 3, 96 L. Ed. (3) (1954)] make clear several points that underlie the theory of bail today. First, the sole consideration is to ensure appearance at trial:

"The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty * * *. Like the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused * * *. Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. * * *. [342 U. S. at 4, 5, 72 S. Ct. at 3, 4, 96 L. Ed. 3] (Emphasis supplied)

"Second, the fact that some defendants are more likely than others to flee does not condone the denial of bail:

"Admission to bail always involves a risk that the accused will take flight. That is a calculated risk which the law takes as the price of our system of justice. We know that Congress anticipated that bail would enable some escapes, because it provided a procedure for dealing with them. * * *. [Separate opinion of Mr. Justice Jackson, 342 U. S. at 8, 72 S. Ct. at 5, 96 L. Ed. 3]

"Third, bail cannot be set excessively high:

"*In allowance of bail, the duty of the judge is to reduce the risk*

*by fixing an amount reasonably calculated to hold the accused available for trial and its consequence.* [Fed. Rules Crim. Proc. 46(c)] *But the judge is not free to make the sky the limit, because the Eighth Amendment to the Constitution says:*

'Excessive bail shall not be required * * *.' [Separate opinion of Mr. Justice Jackson, 342 U.S. at 8, 72 S. Ct. at 5, 96 L. Ed. 3]." (Emphasis supplied)

In the majority opinion[9] (*Stack v. Boyle,* 342 U.S. at 4, 72 S. Ct. at 3, 96 L. Ed. 3) it was said (per Vinson, C. J.):

"From the passage of the Judiciary Act of 1789 * * * to the present Federal Rules of Criminal Procedure [Rule 45a], federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. *This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction * * *. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.*" (Emphasis supplied.)

The late Mr. Justice Jackson, in *Williamson v. United States,* 184 F. 2d 280, 282-283 (C.C.A.N.Y. 1950), sitting as a Circuit Judge, pointed out that our judges cannot use high bail as a device to protect society from possible new crimes by the accused, even after conviction.[10] The language used by the Justice was as follows:

"The Government's alternative contention is that defendants, by

----

[9]There was no real dissent, except as to the manner of considering the further proceedings in the case.

[10]Compare Fed. Rules No. 32 and 46(a) (2) of Criminal Procedure with Superior Court Rules No. 32 and 46(a). They differ in language—and possibly in meaning. Under the Federal Rules of Criminal Procedure bail following conviction, whether pending sentence or appeal, is not a matter of right.

misbehavior after conviction, have forfeited their claim to bail. Grave public danger is said to result from what they may be expected to do, in addition to what they have done since their conviction. If I assume the defendants are disposed to commit every opportune disloyal act helpful to Communist countries, it is still difficult to reconcile with traditional American law the jailing of persons by the courts because of anticipated but as yet uncommitted crimes. Imprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this county and so fraught with danger of excesses and injustice that I am loath to resort to it, even as a discretionary judicial technique to supplement conviction of such offenses as those of which defendants stand convicted."

In *Leigh v. United States,* 82 S. Ct. 994, 996, 8 L. Ed. 2d 269, Chief Justice Warren, sitting on an application fof bail, stated, however, that a denial of bail on appeal would be justified in "* * * cases in which, from substantial evidence, it seems clear that the right to bail may be abused or the community may be threatened by the applicant's rleease. * * *." He also intimated that bail might be refused if "* * * there is a likelihood that the applicant will flee the jurisdiction. * * *." And compare *Rehman v. State of California,* 85 S. Ct. 8, 13 L. Ed. 2d 17 (1964), where Mr. Justice Douglas (also sitting in Chambers) denied an application for bail, in light of a finding by the Trial Court, entered in a proceeding to revoke bail, that "'to permit Dr. Rehman to remain on bail pending appeal constitutes an immediate, clear and present danger imperiling, jeopardizing, and threatening the health, safety, and welfare of the community.' * * *."

At a later point, in his opinion, Mr. Justice Douglas said:

"* * *. 'If * * * the safety of the community would be jeopardized, it would be irresponsible judicial action to grant bail.'"

The cited report discusses THE ROLE OF THE BONDSMAN (pages 22-32) and the report brings out at page 32 this factor:

"As independent businessmen, *bondsmen are free to reject*

*prospective clients for any reason, without regard to the consequences to the accused.* A recent concurring opinion by Circuit Judge J. Skelly Wright [in *Pannell v. U. S.* (115 U. S. App. D. C. 339), 320 F. 2d 698, 699 (D. C. Cir. 1963)] commented on this situation in the District of Columbia:

"Certainly the professional bondsmen system as used in this District is odious at best. The effect of such a system is that the professional bondsman hold the keys to the jail in their pockets. They determine for whom they will act as surety— who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fees remain in jail. The court and the commissioner are relegated to the relatively unimportant chore of fixing the amount of bail." (Emphasis supplied.)

70 Yale Law Journal, pages 966/977, has an excellent discussion of the subject of bail, some of which has already been noted. There is little need to quote anything further from that study, which can throw any light on the point under consideration, except to point out that this article notes that in *Leary v. United States,* supra, Mr. Justice Holmes stated, 224 U. S. 567, 575, 32 S. Ct. 599,600:

"* * * bail no longer is the mundium although a trace is the right to arrest. * * *. *The distinction between bail and suretyship is pretty nearly forgotten. The interest to produce the body of the principal in court is impersonal and wholly pecuniary.* * * *." (Emphasis supplied.)

It is set forth in 8 C.J.S. Bail Sec. 29b that:

"In criminal cases a bail bond is an obligation, with one or more sureties, conditioned that the same may be void on the performance by accused of such acts as he may therein be required to perform. It is a contract under seal, executed by accused, and from its nature requiring sureties or bail to whose custody he is committed."

A number of cases are cited in the footnote on page 55 of 8 C. J. S.; many refer to a bail bond as "a contract" or "covenant".

In 8 Am. Jur. 2d, Sec. 57, page 817—Bail and Recognizance—it is stated:

"*'The bond in a criminal action is in the nature of a contract between the government on one side and the defendant and his surety on the other.* The sureties who sign the bond are generally held to have consented to the terms thereof, and those terms may be modified by the statute under which the bond is required and given. *In general the state and surety agree that if the state will release the defendant from custody, the surety will undertake that the defendant will appear personally and at a specified time and place to answer the charge made against him. If the defendant fails to appear at the proper time and place, the surety becomes the absolute debtor of the state for the amount of the bond.* (Emphasis supplied.)

"In the absence of any conflict with statutory provisions, the bond is construed and applied by the courts according to its express terms. * * *."

Vol. 4, Sec. 1816, Wharton's Criminal Procedure[11] states the applicable rule in this language:

"Bail is evidenced by a bond or recognizance which ordinarily becomes a record of the court. *A bail bond is a contract between the government, on the one side, and the principal and sureties, on the other.* In the absence of any conflict with statutory provisions, *it is construed* and applied by the courts *according to its express terms, and with reference to the specific purpose for which the bond was intended.* Sureties are generally held, by signing a bond, to have consented to the terms thereof." (Emphasis supplied.)

The consideration for a bail bond as between the State and the sureties thereon is the release of the defendant charged with crime,

---

[11]See footnote 12 below.

and such release is a sufficient consideration for each part of the bond. 8 C.J.S. Bail Sec. 54, page 163.

In light of the background of bail and other factors as they have been considered heretofore, page 878, et seq., it is clear that the sureties in the case before me were free to make full inquiry of the defendant Mitchell—either personally, through relatives or the Pennsylvania Police—to determine if they should become sureties; the burden was on them, not the State, to obtain all necessary facts before signing the bail bond. Certainly the accused Mitchell had a clear right to bail—if he could get a bondsman. The magistrate had almost limitless discretion to fix the amount. Considering the history and fundamental principles of bail, I feel compelled to rule that the arguments advanced by the sureties must be rejected, since they are without legal substance. I need only consider the legal effect of the bail piece.

The sureties argue that imprisonment of the principal (Mitchell) in a foreign jurisdiction (Pennsylvania) is "an act of law" and it acted to exonerate the sureties from liability at the time of default where it appeared the principal was incarcerated in said foreign jurisdiction, at the time the principal was scheduled to appear in Delaware, for prior offenses committed before or after they became sureties. I can't read the cases to support the contention made by the sureties.

The condition set forth in Mitchell's bond, supra, page 875, required him to "appear before the Superior Court * * * there to answer such matters and things as shall be objected against him * * *" and directed that he "shall not depart the court without leave thereof until final judgment of the court on said matters charged against him", in which case "this recognizance to be void, otherwise to be in full force and virtue". It is to be noted that the bond has no exceptions in it; if exceptions are to be recognized then they must be set forth in the bail or based on law.

The court notes that Mitchell had been arrested (supra, p. 874)

in Pennsylvania on July 17, 1964, on a Pennsylvania offense, and had been released on bond when he was arrested on the Delaware offense which led to his giving bond in Delaware on August 10, 1964. The State says it was ignorant of this, as do the sureties. I can find no case which affects Mitchell's right to bail or relieves the sureties because Mitchell had given bail prior to the time when the bail bond before me was executed and delivered on August 10, 1964.

Sureties' counsel cited 8 Am. Jur. 2d—Bail—Sec. 184 and 4 Wharton's Cr. Proced.[12], Sec. 1836, p. 678, n. 7, in support of his position. The reference to 8 Am. Jur.—Bail—does not support the sureties' position nor does 8 C.J.S. Bail Sec. 77, page 210. In the last cited treatise under the cited section there is some discussion of the effect of arrest and imprisonment in given circumstances, and as constituting a discharge of his bail. At 8 C.J.S., at page 210, it is clearly stated:

"In another state. In their internal relations the states of the Union are foreign to each other, and the act of one cannot operate to defeat an obligation incurred to another; and hence *if the performance of a recognizance is rendered impossible by the imprisonment of the principal in another state, it is not such an act of law as will discharge bail.*" (Emphasis supplied.)

Many cases are cited in support of this cited statement.

Counsel for sureties also cited an Annotation in 4 A.L.R. 2d at

---

[12] Anderson Edition, 1957. All citations to Wharton are to such edition. It is stated by the author, at the section cited, that a "surety is discharged from liability when the nonappearance of the defendant has been caused by an official act of the state, an act of law, * * * or a subsequent arrest and extradition of the defendant to another jurisdiction * * *." We have no such facts and circumstances before the court that relate to the first two exceptions and he appears to be in error on his third exception, so the citation is inapposite, as are *Canby v. Griffin,* 3 Har. 333 (Super. Ct. 1841) and *State v. Roop,* 1 Marv. 535, 536, 41 A. 196, 197 (Super Ct. 1893), since the facts of these cases are so different from those in the case at bar.

page 440, in support of their position. It is, however, stated further along in this cited annotation—at page 446—that:

"Under the common-law rule that sureties will be exonerated or relieved where the appearance of their principal is rendered impossible by an act of law, the question has often arisen whether imprisonment by another state will release bail given in a state court. *Such imprisonment has generally been held not to excuse the production of the principal.*" Emphasis supplied.)

Below will be found a collection of cases which hold that imprisonment of a person by another state who has been released on bail will not—as an act of law—excuse the production of such person when it is time for the appearance of that person before the court where the bail is applicable. *Cain v. State,* 55 Ala. 170, 172 (1876); *State v. Stanton,* 59 Ariz. 55, 122 P. 2d 855, 856 (1942); *Adler v. State,* 35 Ark. 517, 534 (1880); *Bowling et. al. v. State,* 229 Ark. 441, 316 S. W. 2d 343, 345 (1958); *Vatcher v. Egas,* 100 Cal. App. 99, 279 P. 1029, 1030 (1929); *People v. Durbin,* 218 Cal. App. 2d 851, 32 Cal. Rptr. 569, 572 (1963); *Taintor v. Taylor,* 36 Conn. 242, 252; *Taylor v. Taintor,* 16 Wall. 366, 371, 21 L. Ed. 287, 290 (Conn.); *Public Service Mut. Ins. Co. v. State,* 135 So. 2d 777, 779 (Fla. App., 1961); *Burd v. Commonwealth,* 335 S. W. 2d 945, 948 (Ky. Ct. of App., 1960); *State v. Altone,* 140 Me. 210, 35 A. 2d 859, 860 (1944); *State v. Wynne,* 356 Mo. 1095, 204 S. W. 2d 927, 930 (1947); *State v. Honey,* 165 Neb. 494, 86 N. W. 2d 187, 189 (1957); *Continental Cas. Co. v. People,* 202 Misc. 740, 111 N. Y. S. 2d 495, 498 (N. Y. Sup. Ct., 1952); *People v. Hernandez,* 15 A. D. 2d 798, 224 N. Y. S. 2d 703, 704 (App. Div. 1962); *State v. Pelley,* 222 N. C. 684, 24 S. E. 2d 635, 638 (1943); *Metcalf v. State,* 57 Okl. 64, 156 P. 305, 307, L. R. A. 1916E, 595 (1916); *Ricks v. State,* 189 Okl. 598, 119 P. 2d 51 (1941); *Ward v. State ex rel. Carman,* 200 Okl. 51, 196 P. 2d 856, 858, 4 A. L. R. 2d 436 (1947); *Weber v. United States,* 32 F. 2d 110, 111 (C. C. A. Okl. 1929); *Wallace v. State,* 196 Tenn. 577, 269 S. W. 2d 780, 783 (1954) and *State v. Douglas,* 91 W. Va. 338, 112 S. E. 584, 26 A. L. R. 408 (1922).

Concededly there are decisions which seemingly support sureties' position, and are opposed to the holdings of the cases enumerated supra—see *Allison v. People,* 132 Colo. 156, 286 P. 2d 1102 (1955); *State v. Reed,* 127 Wash. 166, 219 P. 833 (Wash. 1923); *State v. Heslin,* 63 Wash. 2d (957, 389 P. 2d 892 (1964); and *State v. Williams,* 48 N. D. 1259, 189 N. W. 625 (1922)—but these are few. Then there are other cases, where some courts, by way of dicta, have indicated that a surety is discharged if his principal is in jail in another state, through some fault of the principal. The reasoning which underlies such dicta is less than clear and convincing, as well as being contrary to established principles of contract law, and since I am not impressed with these cases I reject them. I prefer the rule which is supported by the many cases I have cited on page 885, since they seem to be what I would regard as the "majority" rule, and are based on the applicable principles of contract law.

The sureties finally urge that the court has some discretion in whether or not to order a forfeiture and they argue the facts here are such that the court should, in the exercise of such discretion, deny the motion to forfeit.

Starting with the fundamental nature of a bail undertaking—that it is a suretyship contract—it is clear that Mitchell has violated the condition of the bail bond, in that (a) he did depart the court without leave; and (b) he did not appear to answer the charge set forth in the bond. These, or either of them, have resulted in the bond being breached, making the sureties debtors of the State and liable under the bond, 72 C.J.S. Principal and Surety Sec. 95. The general rules of construction of contracts are applicable to suretyship undertakings, 72 C. J. S. Principal and Surety Sec. 100. This court is given no discretion—as I already have shown, in whether or not to declare a forfeiture. The rule clearly states that if "there is a breach of condition * * *, the court *shall* declare forfeiture of the bail". Rule 46(f) (1); see discussion in footnote 5, page 887 in declaring a forfeiture of the bond.

At another time and under a different circumstance the sureties

may be free to move to set aside or to remit the forfeiture. At this time, in light of the conceded facts, the court finds a breach of the bail bond and declares a forfeiture.

An order will be entered granting the motion and declaring a forfeiture.